Slip Op.17-15

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ALLSTAR MARKETING GROUP, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Before: Mark A. Barnett, Judge<br><br>Court No. 13-00395 |

OPINION

[The court finds that the subject imports are properly classified as "blankets" under HTSUS subheading 6301.40.00.  Accordingly, the court grants Plaintiff's motion for summary judgment and denies Defendant's cross-motion for summary judgment.]

Dated:February 10, 2017

Joseph M. Spraragen, Robert B. Silverman, and Frank J. Desiderio, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of New York, NY, for Plaintiff.

Hardeep K. Josan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for Defendant.  With her on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, and Amy M. Rubin, Assistant Director.  Of counsel on the brief was Chi S. Choy, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection of New York, NY.

Barnett, Judge:  Before the court are cross-motions for summary judgment.  *See*

Pl.'s Mot. for Summ. J., ECF No. 39; Mem. of Law in Supp. of Pl.'s Mot. for Summ. J.

("Pl.'s MSJ"), ECF No. 39-2; Def.'s Cross-Mot. for Summ. J. & Def.'s Mem. of Law in

Opp'n to Pl.'s Mot. for Summ. J. & in Supp. of Def.'s Cross-Mot. for Summ. J ("Def.'s

XMSJ"), ECF No. 42.  Plaintiff Allstar Marketing Group, LLC ("Allstar" or "Plaintiff")

contests the denial of protest number 2809-11-100237[1] challenging U.S. Customs and

Border Protection's ("Customs") liquidation of the subject import, a polyester fleece knit

article referred to as a "Snuggie®," under subheading 6114.30.30 of the Harmonized

Tariff Schedule of the United States ("HTSUS"),[2] as "Other garments, knitted or

crocheted: Of man-made fibers: Other," dutiable at 14.9 percent *ad valorem*.  *See*

*generally* Compl., ECF No. 6; *see also* Pl.'s MSJ at 8-27; Pl.'s Mem. of Law in Resp. to

Def.'s Cross-Mot. for Summ. J. ("Pl.'s Resp.") at 1-18, ECF No. 51.[3]  Plaintiff contends

that Customs should have classified the subject imports under subheading 6301.40.00,

HTSUS, as "Blankets," dutiable at 8.5 percent *ad valorem*, or alternatively, under

subheading 6307.90.98, HTSUS, as "Other made up articles," dutiable at 7 percent *ad*

*valorem.* Pl.'s MSJ at 27-31; Pl.'s Resp. at 18-22.  Defendant, United States, contends

that Customs correctly classified the subject imports pursuant to subheading

---

[1] In March 2013, Plaintiff filed suit challenging nine protest denials covering 30 entries of merchandise.  *See Allstar Marketing Group, LLC v. United States*, Court No. 13-00110, Summons at 3-6, ECF No. 1.  On December 11, 2013, this court granted Plaintiff's consent motion to sever protest number 2809-11-100237 and related entries and include them in a new action designated Court No. 13-00395.  *See* Order (Dec. 11, 2013), ECF No. 1.  Herein, all references to the Summons are to the Summons filed in Court No. 13-00110.

[2] All citations to the HTSUS refer to the 2009 version, as determined by the date of importation of the merchandise.

[3] There are two entries at issue, Entry Numbers 231-9479092-2 and 231-9480435-0, which entered at the Port of San Francisco on December 12, 2009, and December 18, 2009, respectively, and which Customs liquidated on October 22, 2010, and October 29, 2010, respectively.  Summons at 3.  In connection with another protest filed by Allstar regarding different Snuggie® styles than those at issue here, Customs issued Headquarters Ruling HQ H145555.  Def.'s Ex. C (HQ H145555) (Aug. 6, 2012), ECF No. 42-1.  Therein, Customs determined that the Snuggie® should be classified as a garment pursuant to heading 6114.  Def.'s Ex. C at 14.  On that basis, on September 26, 2012, Customs denied the protest at issue in this case.  *See* Def.'s XMSJ at 2.

6114.30.30.  Def.'s MSJ at 7-18; *see also* Def.'s Reply Mem. in Further Supp. of Def.'s

Cross-Mot. for Summ. J. ("Def.'s Reply") at 2-7, ECF No. 54.  Defendant agrees that if

the court finds the Snuggie® not classifiable as a garment or blanket, it should be

classified under heading 6307.  Def.'s XMSJ at 20.

There is no genuine issue of material fact regarding the properties of the subject

import that would preclude summary judgment.  The sole issue before the court is

whether, as a matter of law, the Snuggie® should be classified under heading 6114,

6301, or 6307.[4]  For the following reasons, the court finds the subject import is properly

classified as a blanket under subheading 6301.40.00.

BACKGROUND

## I.    Material Facts Not in Dispute

The court's rule regarding summary judgment requires the moving party to show that

"there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  United States Court of International Trade ("USCIT") Rule

56(a).  Movants should present material facts as short and concise statements, in

numbered paragraphs, and cite to "particular parts of materials in the record" as

support.  USCIT Rule 56(c)(1)(A); *see also* USCIT Rule 56.3(a)("factual positions

described in Rule 56(c)(1)(A) must be annexed to the motion in a separate, short and

---

[4] The court must consider the correctness of the government's classification, both independently and in comparison with the importer's alternative, in order to arrive at the correct result.  *EOS of N. Am., Inc. v. United States,* 37 CIT ___, ___, 911 F. Supp. 2d 1311, 1317–18 (2013) (quoting *Jarvis Clark Co. v. United States,* 733 F.2d 873, 878 (Fed.Cir.1984)); *see also Latitudes Int'l Fragrance, Inc. v. United States,* 37 CIT ___, ___, 931 F. Supp. 2d 1247, 1252 (2013).

concise statement, in numbered paragraphs").  In responsive papers, the nonmovant "must include correspondingly numbered paragraphs responding to the numbered paragraphs in the statement of the movant."  USCIT Rule 56.3(b).  Parties submitted separate statements of undisputed material facts with their respective motions and responses to the opposing party's statements.  *See* Pl.'s Statement of Material Facts not in Dispute ("Pl.'s SOF"), ECF No. 39-1; Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("Def.'s Resp. to Pl.'s SOF"), ECF No. 42-2; Def.'s Statement of Undisputed Material Facts in Supp. of its Cross-Mot. for Summ. J. ("Def.'s SOF"), ECF No. 42; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ("Pl.'s Resp. to Def.'s SOF"), ECF No. 51-1.  Upon review of Parties' facts (and supporting exhibits), the court finds the following undisputed and material facts. [5]

## A.      Facts Regarding Jurisdiction

Customs liquidated Entry Numbers 231-9479092-2 and 231-9480435-0 under tariff classification 6114.30.30, HTSUS, dutiable at 14.9 percent *ad valorem*, on October 22, 2010 and October 29, 2010, respectively.  Summons at 2-3; Compl. ¶ 47; Answer ¶ 47, ECF No. 18; Pl.'s SOF ¶ 7; Def.'s Resp. to Pl.'s SOF ¶ 7.  Allstar timely protested, claiming the subject imports should have been liquidated under tariff classification 6301.40.00 or 6307.90.98.  Summons at 2; Compl. ¶ 3, Answer ¶ 3.

---

[5] Citations are provided to the relevant paragraph number of the undisputed facts and response; internal citations generally have been omitted.

### B.    Facts Regarding the Subject Imports

Allstar is the importer of record of the subject merchandise.  Pl.'s SOF ¶ 1; Def.'s Resp. to Pl.'s SOF ¶ 1.  "The subject merchandise consists of an adult-sized Snuggie®, designated by Allstar as Item [Numbers] 21065 [(serial number SN011106)] and 21495 [(serial number SN31106)]."[6]  Pl.'s SOF ¶ 6; Def.'s Resp. to Pl.'s SOF ¶ 6; Def.'s SOF ¶ 2; Pl.'s Resp. to Def.'s SOF ¶ 2.  The Snuggie consists of polyester fleece knit, is made in one size only, and measures 71 inches by 54 inches.  Pl.'s SOF ¶¶ 15, 28; Def.'s Resp. to Pl.'s SOF ¶¶ 15, 28; Def.'s SOF ¶ 1; Pl.'s Resp. to Def.'s SOF ¶ 1.  It has "sleeves" that are 28.5 inches long.  Pl.'s SOF ¶¶ 16, 28; Def.'s Resp. to Pl.'s SOF ¶¶ 16, 28.  There is no closure, and it is open in the back.  Pl.'s SOF ¶ 28; Def.'s Resp. to Pl.'s SOF ¶ 28.

The Snuggie® was inspired by the "Slanket®" and the "Freedom Blanket," two products already on the market that were marketed as blankets.  Pl.'s SOF ¶ 10; Def.'s Resp. to Pl.'s SOF ¶ 10.  In discussions with the foreign vendor of the subject imports, and in purchase orders and specifications submitted thereto, Allstar referred to the Snuggie® as a blanket.  Pl.'s SOF ¶ 11; Def.'s Resp. to Pl.'s SOF ¶ 11.  Commercial invoices in the subject entries described the Snuggie® as a "Snuggie Fleece Blanket" or "Snuggie Fleece Blnkt."  Pl.'s SOF ¶ 4; Def.'s Resp. to Pl.'s SOF ¶ 4.  Likewise,

---

[6] Serial number SN011106 corresponds to the royal blue Snuggie®; serial number SN31106 corresponds to the camel colored Snuggie®.  Compl., Ex. B (physical samples of the different colored Snuggies®); Notice of Manual Filing (Mar. 4, 2014) (notice of manual filing of two physical samples of the Snuggie® and retail packaging), ECF No. 9

purchase orders from and invoices to Plaintiff's retail customers describe the Snuggie®

as a blanket.  Pl.'s SOF ¶ 12; Def.'s Resp. to Pl.'s SOF ¶ 12.  Allstar obtained trademark

protection from the U.S. Patent and Trademark Office to use the mark "Snuggie[®]" on

"fleece blankets and throws."  Pl.'s SOF ¶ 14; Def.'s Resp. to Pl.'s SOF ¶ 14.

To produce the Snuggie®, the factory cuts polyester fleece knit into rectangles

and hems all four sides using a machine over-locked or "blanket" stitch.  Pl.'s SOF ¶ 17;

Def.'s Resp. to Pl.'s SOF ¶ 17.  Two holes are cut, and "tubes" of the same polyester

fleece are sewn onto the holes.  Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17.[7]

Inspection reports taken for Plaintiff included the following measurements: "length,

width, sleeve length, armhole, cuff, across back shoulder, [and] distance from armhole

to edge."  Def.'s SOF ¶ 8; Pl.'s Resp. to Def.'s SOF ¶ 8.[8]

---

[7] The "tubes" are merely "sleeve-like" according to Plaintiff, or are "sleeves" according
to Defendant.  Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17.  *But see* Pl.'s SOF ¶ 28
(stating the length of the Snuggie®'s "sleeves"); Pl.'s Resp. to Def.'s SOF ¶ 1 (admitting
that "sleeves [are] sewn into the armholes").  Thus, Parties agree that the "tubes"
attached to the polyester fleece rectangles may be characterized as "sleeves."
[8] Allstar avers the Snuggie® meets "the voluntary blanket flammability standard" stated
in "ASTM D4151 Standard Test Method for Flammability of Blankets."  Pl.'s SOF ¶ 13
(citing Declaration of Scott Boilen ("Boilen Decl.") ¶ 11 & Ex. D, ECF No. 39-13).
Defendant "[a]dmits that the cited declaration supports the statement," but avers that
the product tested may not have been the subject imports because the tested sample
was described as a "Snuggle Up Fleece Knit Blanket."  Def.'s Resp. to Pl.'s SOF ¶ 13
(citing Boilen Decl., Ex. D).  The test report appended to the Boilen Declaration
describes the "Snuggle Up Fleece Knit Blanket" as made from 100 percent polyester
fleece and measuring 71 inches by 54 inches, which matches Snuggie® specifications.
Boilen Decl., Ex. D; *see also* Pl.'s SOF ¶¶ 8, 15; Def.'s Resp. to Pl.'s SOF ¶¶ 8, 15.
Though arguably material to the classification analysis discussed *infra*, the outcome of
the analysis does not turn on resolving this issue.  Thus, there is no "genuine issue" of
"material fact" barring summary judgment.  *See Gill v. District of Columbia*, 751 F. Supp.
2d 104, 107–08 (D.D.C. 2010) ("A 'genuine issue' is one whose resolution could
establish an element of a claim or defense and, therefore, affect the outcome of the

In addition to being the importer of record, Allstar markets and sells the

Snuggie®.  Pl.'s SOF ¶ 9; Def.'s Resp. to Pl.'s SOF ¶ 9.  Allstar markets the Snuggie®

in television commercials, print media, and copy printed on the boxes in which the

Snuggie® is sold.  Pl.'s SOF ¶ 20; Def.'s Resp. to SOF ¶ 20.  Retail packaging and

television advertising describe the Snuggie® as a blanket with sleeves.  Compl., Ex. B,

(retail packaging describing the Snuggie® as "The Blanket That Has Sleeves"); Def.'s

SOF ¶ 5; Pl.'s Resp. to Def.'s SOF ¶ 5;[9] Def.'s Ex. D at 00:22 (DVD copy of television

commercial describing the Snuggie® as "The Blanket With Sleeves!"); Notice Of Manual

Filing (July 29, 2016) (notice of manual filing of video disc), ECF No. 44; Def.'s SOF ¶ 6;

Pl.'s Resp. to Def.'s SOF ¶ 6 (disputing Defendant's characterization of the television

commercial, but asserting the DVD "produced as Defendant's Exhibit D is the best

evidence of its contents").

---

action.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317,  322 (1986)).

[9] Allstar avers it markets the Snuggie® as a "blanket."  Pl.'s SOF ¶ 21 (citing Boilen Decl. ¶¶ 17, 23, 24).  Mr. Boilen declares that the Snuggie®'s retail packaging "refers to the product as a blanket," and "printed marketing materials . . . always describe the [subject imports] as a blanket."  Boilen Decl. ¶¶ 23, 24 (citing Boilen Decl., Ex. G) (print copy advertising the Snuggie® as "[t]he one and only Snuggie®, the blanket that keeps you totally warm and gives you the freedom to use your hands.").  Defendant denies Plaintiff's assertion, and avers that Allstar markets the Snuggie as "The Blanket That Has Sleeves."  Def.'s Resp. to Pl.'s SOF ¶ 21 (citing Def.'s Ex. A (photocopy of retail packaging), ECF No. 42-1); *see also* Def.'s SOF ¶ 5 (asserting that retail packaging describes the Snuggie® as "The Blanket That Has Sleeves") (citing Compl., Ex. B; Def.'s Ex. A).  Plaintiff denies Defendant's assertion, concedes that Defendant quotes from the language on the retail packaging, but avers that the retail packaging produced as an Exhibit to the complaint "is the best evidence of its contents."  Pl.'s Resp. to Def.'s SOF ¶ 5.  In sum, Parties do not dispute that the retail packaging produced with the complaint refers to the Snuggie, *inter alia*, as "The Blanket That Has Sleeves."  *See* Compl., Ex. B.

The retail packaging states that the Snuggie® enables users to "Keep Hands Free," is made of "Super-Soft Fleece," is "Machine Washable," and is sized "One Size Fits All."  Compl., Ex. B.  The retail packaging shows users wearing[10] the Snuggie® on their front with their arms through the sleeves while reclining or seated on an airplane, couch, bed, and floor, and engaging in activities such as reading, writing, knitting, holding a remote control, using a laptop, holding a baby, and playing backgammon. Compl., Ex. B.  It also shows users wearing the Snuggie® outside, while seated, ostensibly cheering a sports team.  Compl., Ex. B.

The television commercial displays text informing viewers that the Snuggie® enables users to use their hands (for example, to read a book), is made of "[u]ltra-soft fleece," has "[o]versized sleeves," is "[o]ne size fits all," and will keep them "[w]arm from head to toe" "[a]nywhere you go," including the outdoors.  Def.'s Ex. D at 00:22-1:010. The commercial opens with a woman appearing frustrated with her blanket's apparent inability to provide satisfactory coverage, and shows her using a Snuggie® instead. Def.'s Ex. D at 00:11-00:25.  In addition to showing people wearing the Snuggie® while

---

[10] As part of arguing that the Snuggie® is not a garment, Plaintiff disputes whether the Snuggie® is "worn."  Pl.'s MSJ at 10, 16 n.4; Pl.'s Resp. at 8.  Defendant contends the Snuggie® is "worn."  Def.'s XMSJ at 11, 13.  Neither party addresses in detail the significance--if any--of the term "worn," nor its relevance to the classification analysis. Webster's defines "worn" as the past participle of "wear," which in turn is variously defined as "to clothe, put on, wear"; "to bear or have upon the person"; or "to carry on or as if on the person," for example a sword or cane.  Webster's Third New Int'l Dictionary of the English Language Unabridged (2002) ("Webster's") at 2589, 2636.  Accordingly, and as common parlance indicates, the term "worn" is not limited to the context of garments and may be used to refer to a broader array of articles.  Consequently, the court uses the term "wearing" for ease of reference.

engaging in the same activities as depicted on the retail packaging, the commercial also

shows a woman wearing the Snuggie® while standing and pouring coffee in her kitchen.

Def.'s Ex. D at 00:51-00:53.

The Snuggie® is sold in the "bedding, housewares, general merchandise, 'impulse

buy,' or 'as-seen-on-TV' departments of retail stores," never in the wearing apparel

department.  Pl.'s SOF ¶¶ 23-24; Def.'s Resp. to Pl.'s SOF ¶¶ 23-24.[11]

## II.   Procedural History

This case involves two entries of merchandise, consisting of adult sized

Snuggies®, imported in December 2009.  Summons at 3.  In October 2010, Customs

---

[11] Defendant avers that "[p]eople have worn the Snuggie® during pub crawls."  Def.'s SOF ¶ 7 (citing Def.'s Ex. E (black and white copies of photographs of people wearing something that may or may not be the Snuggie®), ECF No. 42-1); *see also* Def.'s XMSJ at 13.  Plaintiff disputes Defendant's assertion, and contends the photographs are not suitable subjects for judicial notice.  Pl.'s Resp. to Def.'s SOF ¶ 7; Pl.'s Resp. at 15-18. Defendant contends "the photographs meet the standard for judicial notice because the information is 'generally known'" on the basis of "[a] quick internet search."  Def.'s Reply at 7.  Judicial notice of an adjudicative fact is appropriate when the fact in question is not subject to reasonable dispute because it "is generally known within the trial court's territorial jurisdiction," or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also* 28 U.S.C. § 2641(a)(2012) ("the Federal Rules of Evidence shall apply to all civil actions in the Court of International Trade").  The photographs are inappropriate subjects for judicial notice. Whether the persons appearing in the photographs are actually wearing the Snuggie® at issue here is "subject to reasonable dispute." *See* Fed. R. Evid. 201(b). Defendant provides no support for the accuracy of the ostensive source, "SnuggiePubCrawls.com." *See* Def. Ex.'s E.  Moreover, mere fact of publication on a website does not make it "generally known."  *See Tri Union Frozen Prod., Inc. v. United States*, 40 CIT ___, ___, 161 F. Supp. 3d 1333, 1337 (2016) ("The standard is not that the offered information is 'not subject to reasonable dispute' because it is published on a website, but rather, the standard is that the offered information is not subject to reasonable dispute because it is 'generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'") (citing Fed. R. Evid. 201(b)).  Thus, the court declines to consider the photographs.

liquidated the imports as garments pursuant to subheading 6114.30.30.  Summons at 2,

3.  Allstar timely protested the classification.  Compl. ¶ 3; Answer ¶ 3.  On September

26, 2012, Customs denied the protest.  Summons at 3.  Allstar challenges the denial of

its protest.  Parties have fully briefed the issues.  The court now rules on the cross-

motions for summary judgment.

JURISDICTION AND STANDARD OF REVIEW

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(a).

Jurisdiction is uncontroverted in this case.  Compl. ¶ 1; Answer ¶ 1; Pl.'s SOF ¶ 2; Def.'s

Resp. to Pl.'s SOF ¶ 2.

The Court may grant summary judgment when "there is no genuine issue as to

any material fact," and "the moving party is entitled to judgment as a matter of law."

*Anderson*, 477 U.S. at 247; USCIT Rule 56(a).[12]  The court's review of a classification

decision involves two steps.  First, it must determine the meaning of the relevant tariff

provisions, which is a question of law.  *See Bausch & Lomb, Inc. v. United States*, 148

F.3d 1363, 1365 (Fed. Cir. 1998) (citation omitted).  Second, it must determine whether

the merchandise at issue falls within a particular tariff provision, as construed, which is a

question of fact.  *Id.*  (citation omitted).  When no factual dispute exists regarding the

merchandise, resolution of the classification turns solely on the first step.  *See id.* at

_____

[12] When parties have filed cross-motions for summary judgment, the court generally
must evaluate each party's motion on its own merits, drawing all reasonable inferences
against the party whose motion is under consideration.  *JVC Co. of Am., Div. of US JVC
Corp. v. United States*, 234 F.3d 1348, 1351 (Fed. Cir. 2000); *Specialty Commodities
Inc. v. United States*, 40 CIT ___, ___, 2016 WL 7048013, at *2 (2016).  Here, the
material facts are undisputed.

1365–66; *see also Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1378 (Fed. Cir.

1999).

   The court reviews classification cases *de novo. See* 28 U.S.C. §§ 2640(a),

2643(b). While the court accords deference to Customs classification rulings relative to

their "'power to persuade,'" *United States v. Mead Corp.*, 533 U.S. 218, 235 (2001)

(quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)), it has "an independent

responsibility to decide the legal issue of the proper meaning and scope of HTSUS

terms," *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005)

(citing *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1358 (Fed. Cir. 2001)).

It is "the court's duty to find the correct result, by whatever procedure is best suited to

the case at hand." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed. Cir.

1984).

DISCUSSION

   The General Rules of Interpretation ("GRIs") provide the analytical framework for

the court's classification of goods. *See N. Am. Processing Co. v. United States,* 236

F.3d 695, 698 (Fed. Cir. 2001).  "The HTSUS is designed so that most classification

questions can be answered by GRI 1." *Telebrands Corp. v. United States,* 36 CIT ___,

___, 865 F. Supp. 2d 1277, 1280 (2012), *aff'd* 522 Fed. App'x 915 (Fed. Cir. 2013).

GRI 1 states that, "for legal purposes, classification shall be determined according to the

terms of the headings and any [relevant] section or chapter notes."  GRI 1, HTSUS.

The court must consider Chapter and Section Notes of the HTSUS in resolving

classification disputes because they are statutory law, not interpretive rules.  *Arko*

*Foods Intern., Inc. v. United States*, 654 F.3d 1361, 1364 (Fed. Cir. 2011) (citation

omitted); *N. Am. Processing Co.*, 236 F.3d at 698.

"Absent contrary legislative intent, HTSUS terms are to be 'construed [according]

to their common and popular meaning.'" *Baxter Healthcare Corp. v. United States,* 182

F.3d 1333, 1337 (Fed. Cir. 1999) (quoting *Marubeni Am. Corp. v. United States,* 35 F.3d

530, 533 (Fed. Cir. 1994)).  Courts may rely upon their own understanding of terms or

consult dictionaries, encyclopedias, scientific authorities, and other reliable information.

*Brookside Veneers, Ltd. v. United States,* 847 F.2d 786, 789 (Fed. Cir. 1988); *BASF*

*Corp. v. United States,* 35 CIT ___, ___, 798 F. Supp. 2d 1353, 1357 (2011).  For

additional guidance on the scope and meaning of tariff headings and Chapter and

Section Notes, the court also may consider the Explanatory Notes ("EN") to the

Harmonized Commodity Description and Coding System, developed by the World

Customs Organization.  *See Deckers Outdoor Corp. v. United States,* 714 F.3d 1363,

1367 n. 1 (Fed. Cir. 2013).  Although Explanatory Notes do not bind the court's analysis,

they are "indicative of proper interpretation" of the tariff schedule.  *Lynteq, Inc. v. United*

*States*, 976 F.3d 693, 699 (Fed. Cir. 1992) (quoting H.R. Rep. No. 100–576, at 549

(1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1582) (quotation marks

omitted).

## I.      Tariff Headings at Issue

Customs liquidated the subject imports as garments pursuant to subheading

6114.30.30.  The United States contends Customs correctly classified the subject

imports.  Def.'s XMSJ at 6-9; Def.'s Reply at 2-5.  This subheading covers:

> **6114**   Other garments, knitted or crocheted:
>
>> 6114.30         Of man-made fibers:
>>
>> 6114.30.30   Other:……………………………………………14.9%

Allstar contends that the subject imports are not garments, but are blankets

classifiable under subheading 6301.40.00. Pl.'s MSJ at 8, 27-30.  This subheading

covers:

> **6301**   Blankets and traveling rugs:
>
>> 6301.40:         Blankets (other than electric blankets) and traveling
>>
>> rugs, of synthetic fibers:
>>
>> 6301.40.00:   Other:…………………………………………………...8.5%

If the court finds that the Snuggie® is not a garment or a blanket, Parties agree

that the Snuggie® is classifiable as an "other made up article."  Pl.'s MSJ at 30-31;

Def.'s XMSJ at 20.  The relevant basket provision covers:

> **6307**   Other made up articles, including dress patterns:
>
>> 6307.90:         Other:
>>
>> 6307.90.98   Other:…………………………………………………..7.5%

## II.      Relationship Between the Competing Classifications

All of the asserted classifications fall within Section XI of the HTSUS, which covers "textiles and textile articles," and includes Chapters 50 to 63 of the HTSUS. Chapter 61 (which covers "articles of apparel and clothing accessories, knitted or crocheted") and Chapter 63 (which covers, *inter alia*, "other made up textile articles") apply only to "made up" articles.  Note 1 to Chapter 61; Note 1 to Chapter 63.[13]  Note 7(e) to Section XI defines "made up" as, *inter alia*, an item "[a]ssembled by sewing, gumming or otherwise."[14]  Parties do not dispute that the Snuggie® is assembled by sewing.  Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17 (Snuggie® is produced in part by sewing sleeves onto the holes cut into the rectangular polyester fleece knit fabric). Thus, the Snuggie® is a made up article.[15]

Note 2(a) to Chapter 63 states that subchapter 1 to Chapter 63, which includes headings 6301 to 6307, does not cover "[g]oods of chapters 56-62."  Parties agree that if the Snuggie® is properly classified as a garment pursuant to heading 6114, it is not

---

[13] Chapter 61 applies only to "made up knitted or crocheted articles."  Note 1 to Chapter 61.  Chapter 63 applies only to "made up articles, of any textile fabric."  Note 1 to Chapter 63.

[14] Excluded from the definition of "made up" are "piece goods consisting of two or more lengths or identical material joined end to end and piece goods composed of two or more textiles assembled in layers, whether or not padded."  Note 7(e) to Section XI.

[15] Parties do not expressly address the definition of "made up" or its application to the Snuggie®.  However, the proposed classifications imply the absence of dispute.  *See* Pl.'s MSJ at 30 ("[I]t cannot be disputed that the subject merchandise is a 'made up article.' . . . [S]ince it is [D]efendant's position that the subject merchandise is classifiable in Chapter 61, it necessarily follows that [D]efendant agrees that the Snuggie® is a made up article.").

classifiable as a blanket or other textile pursuant to headings 6301 and 6307.   Pl.'s

MSJ at 9; Def.'s XMSJ at 7.   Accordingly, the court first addresses whether the

Snuggie® is classifiable as a garment under subheading 6114.30.30.

## III.   The Snuggie® is Not Classifiable under Subheading 6114.30.30.

The GRIs govern the proper classification of merchandise and are applied in

numerical order.  *N. Am. Processing Co.*, 236 F.3d at 698.  "Under GRI 1, the Court

must determine the appropriate classification 'according to the terms of the headings

and any relative section or chapter notes' . . . [with] terms of the HTSUS . . .  construed

according to their common commercial meaning."  *Millenium Lumber Dist. Ltd. v. United

States*, 558 F.3d 1326, 1328-29 (Fed. Cir. 2009) (citations omitted).

Subheading 6114.30.30 is an *eo nomine* provision covering "Other garments,

knitted or crocheted: Of man-made fibers: Other:"  *See GRK Canada, Ltd. v. United

States*, 761 F.3d 1354, 1361 (Fed. Cir. 2014) (Reyna, J., dissenting) (noting that the

HTSUS has distinctive use and *eo nomine* provisions; defining *eo nomine* as that which

"describes an article by a specific name") (citations omitted); *see also H.I.M./Fathom,

Inc. v. United States*, 21 CIT 776, 783, 981 F. Supp. 610, 617 (1997) (heading 6114 is

not a use provision).  Parties agree that the Snuggie® consists of polyester knit fleece.

Pl.'s SOF ¶ 17; Def.'s Resp. to Pl.'s SOF ¶ 17; Def.'s SOF ¶ 1; Pl.'s Resp. to Def.'s SOF

¶ 1.  The issue is whether the Snuggie® is classifiable as a garment.  "Garment" is not

defined in the relevant section or chapter notes or in the legislative history.  Accordingly,

the court considers its common commercial meaning.

To that end, Parties disagree whether the court should consider the meaning of "apparel" or "wearing apparel" to inform its interpretation of the term "garment."  Plaintiff contends that "apparel" is interchangeable with "garment" and "clothing," and relies on the Court of Appeals for the Federal Circuit's ("Federal Circuit") interpretation of "wearing apparel" in *Rubie's Costume Co. v. United States*, 337 F.3d 1350 (Fed. Cir. 2003).  *See* Pl.'s MSJ at 9-10.  Defendant argues that Allstar's reliance on the definition of "wearing apparel" is misplaced because the phrase does not appear in the headings, section notes, or chapter notes for Chapter 61.  Def.'s XMSJ at 10-11.  Defendant further contends that *Rubie's Costume* is inapposite because it interpreted Note 1(e) to Chapter 95, not heading 6114.  Def.'s Reply at 4.  Defendant asserts that "garment" is defined as "'an article of outer clothing (as a coat or dress) usu. exclusive of accessories,'" and "[c]lothing is defined as 'covering for the human body or garments in general: all the garments and accessories worn by a person at any one time.'"  Def.'s XMSJ at 8 (quoting *H.I.M./Fathom*, 21 CIT at 781, 981 F. Supp. at 615 (1997) (quoting Webster's Third New Int'l Dictionary of the English Language Unabridged (1993) at 428, 936).

"Fundamentally, courts interpret statutory language to carry out legislative intent." *Rubies Costume*, 337 F.3d at 1357 (citing *Nippon Kogaku (USA), Inc. v. United States*, 69 C.C.P.A. 89, 673 F.2d 380, 383 (1982)); *see also EOS of N. Am., Inc. v. United States*, 37 CIT ___, ___, 911 F. Supp. 2d 1311, 1318 (2013).  As noted above, Chapter 61 covers "articles of apparel and clothing accessories, knitted or crocheted."  Note 14 to Section XI states, *inter alia*, that the phrase "textile garments" means garments

covered by headings 6101 to 6114.  A review of the headings of Chapter 61 indicates a delineation whereby headings 6101 to 6114 cover garments,[16] and headings 6115 to 6117 cover clothing accessories.[17]  Reading the chapter title in concert with the chapter headings and Note 14 to Section XI suggests the drafters intended the phrase "articles of apparel" in the chapter title to encompass the garment provisions (headings 6101 to 6114), and the phrase "clothing accessories" to encompass the accessory provisions (headings 6115 to 6117).  The notion that the terms "apparel" and "garments" are interchangeable is further supported by The American Heritage Dictionary of the English Language's definition of "garment" as "An article of clothing," and "clothes" as "Articles of dress; *wearing apparel*; *garments*."  The American Heritage Dictionary of the English Language (2000) ("The American Heritage Dictionary") at 350, 725 (emphasis added).  Accordingly, the court considers the meaning of "apparel" and the case law discussing that meaning to inform its interpretation of "garment."

Further, contrary to Defendant's assertion, *Rubie's Costume* considered whether the Halloween costumes at issue were "fancy dress, of textiles, of chapter 61 or 62," such that they were not classifiable pursuant to Chapter 95.  *Rubies Costume*, 337 F.3d at 1357; *see also* Note 1(e) to Chapter 95 ("This chapter does not cover . . . Sports

---

[16] Headings 6101 to 6112 cover specific types of garments; headings 6113 and 6114 are basket provisions for garments.

[17] Heading 6115 covers "Panty hose, tights, stockings, socks and other hosiery, including stockings for varicose veins, and footwear without applied soles, knitted or crocheted"; heading 6116 covers "Gloves, mittens and mitts, knitted or crocheted"; and heading 6117 is a basket provision covering "Other made up clothing accessories, knitted or crocheted; knitted or crocheted parts of garments or of clothing accessories."

clothing or fancy dress, of textiles, of chapter 61 or 62[.]").  If the Halloween costumes

were properly classified as garments pursuant to subheading 6114.30.30, as the

government had contended, then they were not classifiable as "festive articles" under

subheading 9505.90.60, as the trial court had found.  *Rubies Costume*, 337 F.3d at

1351-52.  According to the Federal Circuit, deciding whether the Halloween costumes

were classifiable under Chapter 61 or 62 (covering "Articles of apparel and clothing

accessories, not knitted or crocheted") required interpreting the phrase "wearing

apparel."  *Id.* at 1357.

     The Federal Circuit began its analysis with the U.S. Supreme Court's definition of

"wearing apparel" as "all articles which are *ordinarily* worn—dress in general."  *Id.* at

1357 (quoting *Arnold v. United States,* 147 U.S. 494, 496 (1893)) (emphasis added in

*Rubie's Costume*).  It further noted that the Customs Court had defined "wearing

apparel" as "clothes or covering[] for the human body worn for decency or comfort," and

stated that "common knowledge indicates that adornment is also an element of many

articles of wearing apparel."  *Rubies Costume*, 337 F.3d at 1357 (quoting *Antonio*

*Pompeo v. United States* ("*Pompeo*")*,* 40 Cust. Ct. 362, 364 (1958)) (alteration omitted).

     Parties disagree whether the *Pompeo* decency/comfort/adornment definition is

disjunctive, whereby an article fulfilling one characteristic constitutes wearing apparel.

Plaintiff argues the *Pompeo* definition is not strictly disjunctive because *Rubie's*

*Costume* found that although the Halloween costumes at issue afforded some decency

or comfort, those features were incidental to the costumes' festive purpose.  Pl.'s MSJ

at 10; Pl.'s Resp. at 8-9.  Plaintiff concedes the Snuggie® offers comfort; however,

Plaintiff contends the Snuggie® is not worn for decency or adornment and asserts that

"all items that impart comfort are not necessar[ily] wearing apparel."  Pl.'s MSJ at 10, 11

& n.2 (citing space heaters, blankets, throws, and sheets as examples).  Defendant

contends the *Pompeo* definition is disjunctive, and the Snuggie® is, thus, "wearing

apparel" because "it is a covering for the human body that is worn for comfort."  Def.'s

XMSJ at 11.  Plaintiff responds that Defendant has misinterpreted *Rubie's Costume*.

Pl.'s Resp. at 8-9.

A review of the Federal Circuit's reasoning in *Rubie's Costume* shows that the

court synthesized the *Arnold* and *Pompeo* definitions.  The court explained:

> While the [Halloween costumes] may simulate the structural features of
> wearing apparel, and have some incidents of "clothes or coverings for the
> human body worn for decency or comfort," Antonio, 40 Cust. Ct. at 364,
> they are not practical "articles which are ordinarily worn," Arnold, 147 U.S.
> at 496, 13 S.Ct. 406.

*Rubie's Costume*, 337 F.3d at 1358.  Although the court considered the Halloween

costumes' tendency to impart decency or comfort relevant to the inquiry, the case

ultimately turned on whether the costumes were "ordinarily worn."  *Id.* at 1358; *see also*

*LeMans Corp. v. United States*, 660 F.3d 1311, 1317 (Fed. Cir. 2011) (discussing

*Rubie's Costume* and noting that the decency or comfort features were secondary to the

festive value of the costumes).  Finding that the costumes were not ordinarily worn, the

court reasoned that although the costumes may impart decency or comfort, "such

benefits are incidental and the imports are primarily created for Halloween fun, strongly

promoting festive value rather than *cognitive association as wearing apparel*.  Such

costumes are generally recognized as not being *normal articles of apparel*."  *Rubies Costume*, 337 F.3d at 1358 (emphasis added).

The dictionary definition of garment proposed by Defendant complements the Federal Circuit's understanding of "wearing apparel."  Webster's defines "garment" as "an article of outer clothing (as a coat or dress) usu. exclusive of accessories," and clothing is defined as "covering for the human body or garments in general: all the garments and accessories worn by a person at any one time."  Webster's at 428, 936; Def.'s XMSJ at 7; *see also LeMans Corp. v. United States*, 34 CIT 156, 163, 675 F. Supp. 2d 1374, 1381 (2010), *aff'd* 660 F.3d 1311 (Fed. Cir. 2011) (considering the Webster's definition of garment); *H.I.M./Fathom*, 21 CIT at 781, 981 F. Supp. at 615 (considering same).

Defendant emphasizes the clothing portion of the definition, asserting that the Snuggie® is "worn as an outer covering for the human body at a particular time, such as when seated, standing, or reclining."  Def.'s XMSJ at 8 (internal quotation marks and citation omitted).  Plaintiff urges the court to focus on the recognized exemplars, asserting that "a garment is something that can be identified as an article of outer clothing[,] such as 'a coat or dress.'"  Pl.'s MSJ at 12; Pl.'s Resp. at 5-6 & n.6 (contending the words "coat or dress" should not be ignored; rather, "they make it clear that common parlance defines garments to be recognized articles of clothing").[18]

---

[18] Parties belabor the need to identify the "any one time" garments are worn to compose clothing.  Pl.'s MSJ at 15 (arguing the Snuggie® is not worn at a particular time because it is used when a person is merely sitting or reclining "virtually motionless"); Def.'s XMSJ at 8-9 (arguing that being seated, standing, or reclining constitutes the "particular time"

The exemplars contained in the garment definition are supported by the *Arnold* interpretation of "apparel" as that which is "ordinarily worn," "ordinarily" being defined as "in the ordinary course of events: usually," or, "in a commonplace . . . way." Webster's at 1589. Reference to the exemplars is also supported by *Rubie's Costume,* which considered the primary purpose of the costumes as "promoting festive value rather than [having] cognitive association as wearing apparel." *Rubie's Costume*, 337 F.3d at 1358; *see also Pompeo*, 40 Cust. Ct. at 366 (crash helmets outside the scope of the term "wearing apparel" because "they would not be considered *in ordinary parlance* to be 'wearing apparel'") (emphasis added).

A review of the specialized articles included in the Explanatory Note ("EN") to heading 6114 also supports interpreting "garment" as identifiable clothing items, and disfavors classifying the Snuggie® as a garment. Pursuant to EN 61.14, heading 6114 covers:

---

the Snuggie® is worn, retail packing shows people wearing the Snuggie® while "playing a board game, holding a baby, sewing, using a remote control or a laptop, and reading a book/magazine"); Def.'s XMSJ at 13-14 (Plaintiff improperly adds "functional mobility" to the "any one time" requirement). Recent cases in this court have paraphrased the definition of garment as "an outer covering for the human body at *a particular time.*" *H.I.M./Fathom*, 21 CIT at 781, 981 F. Supp. at 615 (emphasis added) (finding the definition met because the wetsuits at issue were outer coverings worn while scuba diving); *see also LeMans Corp.*, 34 CIT at 163-64, 675 F. Supp. 2d at 1381-82 (noting that an individual wears motocross jerseys, pants, and motorcycle jackets "at a particular time," such as when "engaging in motocross activities" or riding in off-road courses and public streets). The Webster's definitions of garment and clothing do not require the identification of a particular time or activity in which the wearer may engage; rather, the "any one time" language simply conveys the idea that "clothing" constitutes the garments and accessories a person wears together at some time. What activity one engages in at that time, if any, is immaterial.

(1) Aprons, boiler suits (coveralls), smocks and other protective clothing of a kind worn by mechanics, factory workers, surgeons, etc.
(2) Clerical or ecclesiastical garments and vestments (e.g. monks' habits, cassocks, copes, soutanes, surplices).
(3) Professional or scholastic gowns and robes.
(4) Specialized clothing for airmen, etc. . . .
(5) Special articles of apparel . . . used for certain sports or for dancing or gymnastics (e.g. fencing clothing, jockeys' silks, ballet skirts, leotards).
. . . .

When the nature of the article is unclear, EN 61.14 describes the article by reference to an identifiable clothing type (e.g., coveralls, habits, skirts, leotards). Defendant contends the Snuggie® is akin to "clerical or ecclesiastical garments and vestments" and "professional or scholastic gowns and robes" because those garments "have wide-armed sleeves and flow loosely around the body." Def.'s XMSJ at 18. As Plaintiff contends, however, clerical and ecclesiastical garments have closures. Pl.'s Resp. at 7. It is unclear what constitutes a professional or scholastic "gown," distinct from a "robe," but for Defendant's analogy to hold, at a minimum, one must wear the Snuggie® backwards. Accordingly, the court is not persuaded by Defendant's argument.

Finally, the manner in which the Snuggie® is used also disfavors classification as a garment. Preliminarily, Parties disagree whether use is an appropriate consideration when determining whether a good is properly classified in an *eo nomine* provision. Pl.'s MSJ at 16-17; Pl.'s Resp. at 12 (court should consider whether the Snuggie® is designed, manufactured, marketed, sold, and used as a garment); Def.'s XMSJ at 14-16 (consideration of use is improper because heading 6114 is an *eo nomine* provision); Def.'s Reply at 6. However, a careful review of the relevant Federal Circuit case law confirms the relevance of use in the context of an *eo nomine* provision.

In *GRK Canada*, the Federal Circuit explained that use may be considered in

classifying an article pursuant to an *eo nomine* provision when (1) the use of the subject

article is an important aspect of its identity, and consequently the article's classification;

or, as relevant here, when (2) "determining whether [the subject article] fits within the

classification's scope." *GRK Canada*, 761 F.3d at 1358-59 (internal citations omitted)

(considering use to determine under which *eo nomine* tariff provision to classify certain

screws);[19] *see also CamelBak Prod., LLC v. United States*, 649 F.3d 1361, 1367-69

(Fed. Cir. 2011) (considering such factors as design, use or function, and sales and

---

[19] Recently, in *Sigma-Tau HealthScience, Inc. v. United States*, the Federal Circuit
declined to consider use to determine whether the subject merchandise was covered by
an *eo nomine* provision pertaining to vitamins.  838 F.3d 1272, 1278 (Fed. Cir. 2016).
("Because we conclude that HTSUS heading 2936 is an *eo nomine* provision with
respect to "vitamins," we need not consider the *Carborundum* factors, which pertain only
to certain use provisions of the HTSUS.").  *Carborundum* analyzed whether imported
powdered ferrosilicon "belongs to a class or kind of merchandise which is commonly
used as raw material in the manufacture of ferrous metals."  *United States v. the
Carborundum Co*., 63 C.C.P.A. 98, 101–02, 536 F.2d 373, 376–77 (1976).  The court
relied on the following factors:

> use in the same manner as merchandise which defines the class; the
> general physical characteristics of the merchandise; the economic
> practicality of so using the import; the expectation of the ultimate
> purchasers; the channels of trade in which the merchandise moves; the
> environment of the sale, such as accompanying accessories and the
> manner in which the merchandise is advertised and displayed; and the
> recognition in the trade of this use.

*Aromont USA, Inc. v. United States*, 671 F.3d 1310, 1312–13 (Fed. Cir. 2012) (citing
*Carborundum*, 63 C.C.P.A. at 98, 536 F.2d at 377).  Read together, *GRK Canada* and
*Sigma-Tau HealthScience* stand for the proposition that this court may, but need not,
consider use and related factors when determining the scope of an *eo nomine*
provision.  However, when considering use to determine whether an article fits within
the scope of an *eo nomine* provision, the court is guided by the more limited use factors
referenced in *GRK Canada*, which dealt with use in the context of an *eo nomine*
provision, not *Carborundum*, which dealt with a use provision.

marketing literature to determine whether the inclusion of a hydration component with a

cargo component rendered the subject article beyond the scope of an *eo nomine*

provision for backpacks); *Mast Industries, Inc. v. United States*, 9 CIT 549, 552-53

(1985), *aff'd* 786 F.2d 1144 (Fed. Cir. 1986) (subject imports were designed,

manufactured, marketed and used as nightwear," and, thus, were not classifiable under

the *eo nomine* provision covering "shirts"); *United States v. Quon Quon Co*., 46

C.C.P.A. 70, 73 (1959) (considering use to determine whether "certain rattancore,

woven articles" are baskets) ("While unhesitatingly granting the truth of the contention

that 'baskets' in the tariff act provides for baskets '*eo nomine*,' this does not help us in

the least to decide whether the imported articles *are* baskets.").  Factors guiding this

court's determination whether the Snuggie® is classifiable as a garment include (1) its

"physical characteristics" and "features," (2) "how it was designed and for what

objectives," (i.e., its intended use), and (3) "how it is marketed."  *GRK Canada*, 761 F.3d

at 1358.

  First, as to its physical characteristics and features, the Snuggie® consists of a

71-by-54 inch rectangular piece of polyester fleece knit fabric, with 28.5 inch sleeves

attached to the front.  Pl.'s SOF ¶¶ 15, 16, 28; Def.'s Resp. to Pl.'s SOF ¶¶ 15, 16, 28;

Def.'s SOF ¶ 1; Pl.'s Resp. to Def.'s SOF ¶ 1.  There is no closure, and it is open in the

back.  Pl.'s SOF ¶ 28; Def.'s Resp. to Pl.'s SOF ¶ 28.  *In camera* inspection of the

physical sample reveals a soft, long, loose-fitting article, measuring almost six feet by

4.5 feet, worn on the front, with long, loose sleeves.  *See Trans-Atlantic Co. v. United*

*States*, 60 C.C.P.A. 100, 102–03, 471 F.2d 1397, 1398 (1973) (viewing a sample of the

subject import before concluding that it is covered by an *eo nomine* provision for hinges)

("the sample of the imported merchandise . . . is itself a potent witness").  Defendant

contends the "one size fits all" nature of the Snuggie® supports classifying it as a

garment because "fit" is "characteristic of a specification for garments."  Def.'s XMSJ at

16.  However, "fit" in the context of "one size fits all" is a misnomer, and merely conveys

single size availability.  Notwithstanding the presence of the loose-fitting sleeves, there

is nothing "fitted" about the Snuggie®.[20]  The Snuggie®'s physical characteristics and

features, such as its dimensions and lack of rear closure, do not resemble a "normal

article of apparel," or an article "ordinarily worn" in any "commonplace . . . way."

Second, relevant to design and intended use,[21] the Snuggie® was inspired by

the "Slanket®" and the "Freedom Blanket," two products that are marketed as blankets.

---

[20] Parties separately dispute whether the mere addition of sleeves to the polyester fleece knit fabric renders the Snuggie® classifiable as a garment.  Plaintiff contends the sleeves are not "garment-like."  Pl.'s MSJ at 22-23 (citing Decl. of Hazel Clark, ECF No. 39-14).  Defendant disputes Dr. Clark's expertise in garment construction.  Def.'s Resp. to Pl.'s SOF ¶ 19; Def.'s XMSJ at 15.  Defendant argues that the "sleeves are shaped to the contours of the human body," as evidenced by inspection reports showing that production of the Snuggie® required measuring across the back shoulder.  Def.'s XMSJ at 16-17 (citing Def.'s Ex. G (inspection reports), ECF No. 42-1); *see also* Def.'s SOF ¶ 8; Pl.'s Resp. to Def.'s SOF ¶ 8.  Lexicographic sources and relevant case law do not suggest that the presence of sleeves is outcome determinative.  Rather, the issue is whether the Snuggie®, as a whole, is within the scope of the tariff term "garment" as the court has interpreted it.  Although the sleeves "may simulate [a] structural feature[] of wearing apparel," their addition to the fabric is insufficient to find the Snuggie® a "practical 'article[] . . . ordinarily worn.'"  *Rubies Costume*, 337 F.3d at 1358 (quoting *Arnold*, 147 U.S. at 496).

[21] Parties also discuss manufacturing (garment construction), relying on a mix of disputed and non-disputed facts and testimony.  Pl.'s MSJ at 18-20; Def.'s XMSJ at 15.  Because the Snuggie®'s method of manufacturing is not pertinent, the court need not reach those arguments.  *See GRK Canada*, 761 F.3d at 1358 (discussing factors relevant to a use analysis in the context of an *eo nomine* provision); *CamelBak Prod.*,

Pl.'s SOF ¶ 10; Def.'s Resp. to Pl.'s SOF ¶ 10.  As discussed above, inspection of the

physical sample shows that the Snuggie® was designed (and, thus, intended) to be

loosely worn as an outer layer roughly covering the front of the user to provide warmth.

Compl., Ex. B.  The Snuggie® was not designed and was not intended to be used as a

"normal article of apparel" classifiable as a garment.

Finally, as to sales and marketing, Allstar referred to the Snuggie® as a blanket,

not apparel, in discussions with the foreign vendor of the Snuggie®, and in purchase

orders, specifications, and commercial and retail invoices.  Pl.'s SOF ¶¶ 4, 11, 12; Def.'s

Resp. to Pl.'s SOF ¶¶ 4, 11, 12.  Additionally, Allstar obtained trademark protection to

use the mark "Snuggie®" on fleece blankets and throws.  Pl.'s SOF ¶ 14; Def.'s Resp.

to Pl.'s SOF ¶ 14.  The Snuggie® is sold in the "bedding, housewares, general

merchandise, 'impulse buy,' or 'as-seen-on-TV' departments of retail stores," not in the

apparel department.  Pl.'s SOF ¶¶ 23-24; Def.'s Resp. to Pl.'s SOF ¶¶ 23-24.

Defendant contends that Allstar's emphasis on the sleeves in marketing materials

supports garment classification.  Def.'s XMSJ at 16.  However, retail packaging and

television advertising consistently describe the Snuggie®, *inter alia*, as *a blanket with

sleeves*.  The marketing materials depict people using the Snuggie® as a warm cover,

as one might use a blanket, albeit one held in place and permitting greater use of hands

with the addition of the sleeves.  *See generally* Compl., Ex. B; Def.'s Ex. D.

---

649 F.3d at 1367-68 (discussing same).  *But see Mast Industries*, 9 CIT at 552-53 (that
subject imports were manufactured in the manufacturer's lingerie division supported
classification as nightwear, rather than as shirts).

In sum, after considering the terms of the headings, relevant Section or Chapter

Notes, Explanatory Notes, and the common commercial meaning of garment as stated

in lexicographic sources and case law, the court finds the Snuggie® is not classifiable

under subheading 6114.30.30.[22]  The court turns to whether the Snuggie® is

classifiable under subheading 6301.40.00.

## IV.     The Snuggie® is Classifiable as a Blanket under Subheading 6301.40.00.

As noted above, the court begins with GRI 1 to determine the appropriate

classification according to the terms of the heading and relevant section or chapter

notes, construing terms in accordance with their common commercial meaning.  *N. Am.*

*Processing*, 236 F.3d at 698; *Millenium Lumber Dist.*, 558 F.3d at 1328-29.  Subheading

6301.40.00 is an *eo nomine* provision covering "Blankets (other than electric blankets)

and traveling rugs, of synthetic fibers."

Plaintiff contends the Snuggie® is classifiable under heading 6301 as an

"'enhanced or 'improved' blanket with 'sleeves.'"  Pl.'s MSJ at 28.  Plaintiff further

contends that the ENs to heading 6301, the dictionary definition of "blanket,"

---

[22] Plaintiff also contends that classifying the Snuggie® as a garment "is inconsistent with Customs' longstanding position . . . that textile articles with some apparel features are not necessarily wearing apparel."  Pl.'s MSJ at 23-24 (collecting Customs rulings). Plaintiff further contends the court should consider the opinions expressed by certain Customs' officials that the Snuggie® should not have been classified as a garment. Pl.'s MSJ at 26-27 (citing Pl.'s Ex.'s E-J, ECF Nos. 39-7 to 39-12).  Defendant--correctly--contends that the Customs rulings cited by Allstar are inapposite, and the emails are "irrelevant."  Def.'s XMSJ at 17-18.  Neither Customs' rulings on different merchandise nor Customs' officials' emails, unadopted as the position of the agency, bear on this court's "independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms."  *Warner-Lambert*, 407 F.3d at 1209.

commercial references to the Snuggie® as a "blanket," and its use as a blanket

collectively support its classification under heading 6301.  Pl.'s MSJ at 28-30.

Defendant contends that Plaintiff's dictionary definition does not support classifying the

Snuggie® as a blanket, and "calling an article a blanket [in commerce] does not

necessarily make it a 'blanket' for classification purposes."  Def.'s XMSJ at 18-20.

"Blanket" is not defined in the statute or legislative history; thus, the court

considers its common commercial meaning.  *Baxter Healthcare Corp.,* 182 F.3d at

1337.  Plaintiff proposes the following dictionary definition, defining "blanket" as "a warm

woolen (or nylon etc.) covering used esp. on a bed: any extended covering."  Pl.'s MSJ

at 29 (quoting New Webster's Dictionary and Thesaurus of the English Language,

Lexicon Publications, Inc. (1993) at 102).  Defendant proposes two additional

definitions: *Merriam Webster*, defining "blanket" as "a large usually oblong piece of

woven fabric used as a bed covering; a similar piece of covering used as a body

covering (as for an animal)", and *Oxford Dictionaries*, defining "blanket" as "a large

piece of woolen or similar material used as a bed covering or other covering for

warmth."  Def.'s XMSJ at 19 (citations omitted).  Likewise, The American Heritage

Dictionary defines "blanket" as "[a] large piece of woven material used as a covering for

warmth, especially on a bed."  The American Heritage Dictionary at 94.

Plaintiff "offer[s] as a common meaning that a 'blanket' is a flat, rectangular textile

covering placed over the body to keep the user warm."  Pl.'s MSJ at 29.  Defendant

contends the dictionary "definitions suggest that a blanket is a single, continuous,

uninterrupted piece of fabric that is usually used to cover a bed or an animal."  Def.'s

XMSJ at 19.[23]   Two points emerge from the dictionary definitions: first, that a blanket is

a large (possibly oblong) piece of fabric, and second, that a blanket is used as a

covering for warmth, often, but not always, as common knowledge dictates, on a bed.

*See Brookside Veneers, Ltd.,* 847 F.2d at 789; *BASF Corp.,* 35 CIT at ___, 798 F.

Supp. 2d at 1357 (courts may rely on their own understanding to construe HTSUS

terms); *see also* EN 63.01 (heading 6301 "also covers . . . blankets for cots or prams").

Retail packaging refers to the Snuggie®'s ability to "Keep[] You Warm And Your

Hands Free!"  Compl., Ex. B; Def.'s SOF ¶ 5 (quoting the retail packaging); Pl.'s Resp.

to Def.'s SOF ¶ 5 (the retail packaging is the best evidence of its contents).  The key

inquiry, however, is whether the addition of sleeves transforms what may have been a

blanket, into something that is not a blanket.  *See* Def.'s XMSJ at 19 (the addition of

sleeves transforms a piece of fabric "that may . . . have met the definition of blanket"

into a garment); Pl.'s Resp. at 19 ("The parties appear to agree that after its initial

stages of construction . . . the article resembles a blanket. . . . The basic functionality as

a blanket has not been compromised by the addition of sleeves.").

"Absent limitation or contrary legislative intent, an *eo nomine* provision includes

all forms of the named article, even improved forms."  *CamelBak Prod.*, 649 F.3d at

---

[23] Defendant also contends that Plaintiff's dictionary definition is overbroad because
pursuant to it, "a poncho could arguably be a 'blanket.'"  Def.'s XMSJ at 20.  Plaintiff
disputes this characterization, asserting that a poncho readily meets the definition of
"garment" discussed *supra*, and contrasts the features of a poncho with the Snuggie®.
Pl.'s Resp. at 20-21.  The court need not resolve the Parties' argument because neither
the proper classification of a poncho nor its (dis)similarity to the Snuggie® are material
to resolving the issue before the court.

1364–65 (internal quotation marks, alterations, and citation omitted).  An article that

"has been improved or amplified but whose essential characteristic is preserved or only

incidentally altered is not excluded from an unlimited *eo nomine* statutory designation."

*Casio, Inc. v. United States*, 73 F.3d 1095, 1098 (Fed. Cir. 1996).  However, when the

subject import "is in character or function something other than as described by a

specific statutory provision-either more limited or more diversified-and the difference is

significant," it is not classifiable within that provision.  *Casio*, 73 F.3d at 1097 (citation

omitted).  In other words, courts must assess whether the article has "features

*substantially in excess* of those within the common meaning of the term."  *Casio*, 73

F.3d at 1098 (affirming trial court's classification of a synthesizer as a musical

instrument because the "additional features are designed primarily to make it easier for

a musician to create music or embellish the sound he or she would normally be able to

produce"); *see also CamelBak Prod.*, 649 F.3d at 1368-69 (article composed of

hydration and cargo components was not classifiable as a backpack because it was

principally designed to afford "hands-free" hydration).  Relevant factors include the

subject import's design, use, or function, how the article is regarded in commerce and

described in sales and marketing literature, and whether the addition "is a substantial or

incidental part of the whole product."  *CamelBak Prod.*, 649 F.3d at 1368 (citations

omitted). [24]

---

[24] Beyond general arguments about the significance (or lack thereof) of the sleeves,
Parties do not address the case law relevant to this inquiry.  *See* Pl.'s MSJ at 27-30;
Def.'s XMSJ at 18-20; Pl.'s Resp. at 19-21; Def.'s Reply at 7.

As discussed above, Parties do not dispute that specifications, purchase orders, and invoices describe the Snuggie® as a blanket, and Allstar has trademarked "Snuggie®" to use on blankets and throws.  Pl.'s SOF ¶¶ 4, 11, 12, 14; Def.'s Resp. to Pl.'s SOF ¶¶ 4, 11, 12, 14.  The Snuggie® is marketed as a blanket, albeit one with sleeves.  Compl., Ex. B; Def.'s Ex. D.  Retail packaging depicts people wearing the Snuggie® in the types of situations one might use a blanket; for example, while seated or reclining on a couch or bed, or outside cheering a sports team.  Compl., Ex. B.  The television commercial additionally shows a woman wearing a Snuggie® in place of a blanket that failed to sufficiently cover her.  Def.'s Ex. D at 00:11-00:25.  All of the above indicates that the Snuggie® is designed, used, and functions as a blanket, and is regarded in commerce and described in sales and marketing literature as a blanket.[25] *Cf. CamelBak Prod.*, 649 F.3d at 1368-69 (subject import not classifiable as a backpack when its design and marketing emphasized hydration); *Fairchild Camera & Instrument Corp. v. United States*, 53 C.C.P.A. 122, 124 (1966) (subject import classifiable as a camera when described as such in sales literature and by industry witnesses).

The court further finds that the sleeves are incidental to the Snuggie®'s use as a blanket; the sleeves are not so substantial as to transform the Snuggie® into something other than a blanket.  *See CamelBak Prod.*, 649 F.3d at 1368.  The undisputed facts show that the Snuggie® "preserve[s]" the "essential characteristic[s]" of a blanket--a

---

[25] That the commercial also shows a woman standing and pouring coffee while wearing the Snuggie® does not detract from the court's conclusion.  Def.'s Ex. D at 00:51-00:53.  One can also stand and pour coffee while wearing a "typical" sleeveless blanket over the shoulders.

large piece of fabric providing a warm covering.  *See Casio*, 73 F.3d at 1098.  The

sleeves support, rather than detract from, the Snuggie®'s "primary design and use" as a

blanket because they ostensibly enable the Snuggie® to remain in place and keep the

user warm while allowing the user to engage in certain activities requiring the use of

their hands.  *See* Def.'s Ex. D at 00:11-00:25; *see also CamelBak Prod.*, 649 F.3d at

1368-69 (trial court erred in "discount[ing] the hydration component . . . without

considering the subject articles' primary design and use").  The court thus concludes

that the Snuggie® is correctly classified as a "blanket" under subheading 6301.40.00.[26]

### CONCLUSION

For the foregoing reasons, the court holds that the subject import is properly

classified under tariff provision 6301.40.00, HTSUS.  Thus, the court grants Plaintiff's

motion for summary judgment, and denies Defendant's cross-motion for summary

judgment.  Judgment will be entered accordingly.

/s/      Mark A. Barnett
Mark A. Barnett, Judge

Dated:  February 10, 2017
          New York, New York

---

[26] The court need not reach Parties' alternative proposed classification pursuant to
subheading 6307.90.98, which is a basket provision covering "Other made up articles."
While the Snuggie® is a "made up article," GRI 3(a) mandates classification under the
"most specific description," which, here, is subheading 6301.40.00, covering blankets as
a type of made up textile article.